# *Ex parte* Branch, Sons & Co

### *Petition for Mandamus.*

1. *Prayer, form of; how effects relief to be granted.*—Where the prayer of a petition is that the petitioners may be made parties defendant to a pending cause, *and* that a decree rendered at a former term may be set aside, *and* that they be permitted to file an answer and a cross-bill, *and* for such other *and* further *and* different relief as they may be entitled to, it does not allow as much scope for a decree different from that specifically asked, as it would if disjunctively expressed.

2. *Stranger; when not entitled to be made defendant to cause on petition.* —A stranger to a pending cause cannot intervene by petition, for the purpose of setting aside a sale made under a decree rendered at a previous term, and filing an answer and cross bill in the cause, on a state of facts which would change the entire character of the suit.

3. *Same.*—Under a bill filed to foreclose several mortgages executed by a railroad company for the benefit of its bondholders, a decree of sale having been rendered and executed, but not confirmed, unsecured creditors of the company cannot intervene by petition at the term to which the sale is reported, asking that the sale may be set aside, and that they may be allowed to come in as defendants, and file an answer and cross-bill in the original cause.

4. *Same.*—*Semble* that strangers to the suit, having such an interest in the subject matter that they ought to have been made parties in the first instance, upon alleging errors in the proceedings which would enable them to reverse the decree on appeal, may under some circumstances be made defendants by petition

Petition for *mandamus* to compel the chancellor to allow Branch, Sons & Co., to be made defendants to the suit of *Morris & Lowery, trustees,* v. *The Western Railroad Company of Alabama.*

This petition showed in substance that the Western Railway.
VOL. LIII.

[*Ex parte* Branch & Co.]

road company of Alabama was chartered by an act of the legislature of Alabama, approved February 23, 1860. Two sections of this charter were as follows:

"Sec. 21. *Be it further enacted,* That said company may by its president and directors, by, and with the consent of a majority of the stockholders in value, contract for the purchase of the Montgomery and West Point Railroad, and for the Alabama and Mississippi River Railroad, with all their outfits and property of every kind and description, or for either of them, so as to form the continuous line of railroad contemplated and described by the acts of the Congress of the United States, approved the fourth of September, eighteen hundred and forty-one, appropriating the two per cent. fund of the State of Alabama and Mississippi, to-wit : From a point on the Chattahoochee river, opposite West Point, in the State of Georgia, across the State of Alabama, in the direction of Jackson in the State of Mississippi.

Sec. 22. *Be it further enacted,* That with a view to such purchase, and in order that said railroads, or either of them when purchased, may be incorporated into the Western Railroad Company of Alabama, the president and directors of said company may, upon such purchases being made, by and with a consent of a majority of the stockholders in value, surrender their charter to the comptroller of public accounts, and upon such notice being given, and a publication of the same being made in some newspaper, published in the city of Montgomery, for at least thirty days, the road, or roads, thus purchased shall be incorporated with the Western Railroad Company of Alabama, and be governed by the provisions of this act in all respects, as if said road or roads had been constructed under its provisions. The purchases herein provided for, on the surrender of the franchises, shall in no way affect the rights of the creditors of the company, or companies, whose roads may be purchased, and their separate existence shall be continued as to all the rights and remedies of creditors, and the president of the company incorporated by this act, shall be held in law, as to services of process, as the President of the other company, or companies whose roads, works and property may be purchased, and the said Western Railroad Company may sue for, and recover in its name all debts, dues and demands, from any debtor to said company, whose roads and property may be so purchased."

The Western Railroad as originally constructed, consisted of a line of railroad from Montgomery to Selma, Alabama. The Montgomery and West Point Railroad Company, an

older corporation, had a line of railroad from West Point, Georgia, to Montgomery, Alabama, and also a branch railroad from Opelika, Alabama, to Columbus, Georgia.

On the 2d day of June, 1870, under the foregoing sections of that charter, the stockholders of the Montgomery and West Point Railroad Company passed resolutions authorizing the board of directors to transfer the railroads of that company and all of its property of every kind and description, to the Western Railroad Company of Alabama, on the terms that the latter company should assume the payments of all the debts, obligations and responsibilities of the Montgomery and West Point Railroad Company, and issue its stock, dollar for dollar, in exchange for the capital stock of the last named company.

On the 1st day of August, 1870, the stockholders of the Western Railroad Company of Alabama assented to the purchase of all the railroad and other property of the Montgomery and West Point Railroad Company, on the terms proposed, and authorized its board of directors to make the purchase.

And on the same day the board of directors of the Montgomery and West Point Railroad Company, and the board of directors of the Western Railroad Company of Alabama, by resolutions passed by said boards respectively agreed to such transfer and purchase on the terms above stated; and that the transfer should take place on the 1st day of September, 1870. And the president of the Montgomery and West Point Railroad Company, was then instructed by its board of directors to deliver its road and property to the Western Railroad Company of Alabama, on the 1st day of September, 1870, and to surrender the charter of the company to the comptroller of public accounts. The President made the delivery and the surrender as directed.

At the time of the above agreement and at the time of said delivery and surrender, the Montgomery and West Point Railroad Company was indebted, on its bonds secured by mortgage, in the sum of about $800,000 00, and was also indebted by other bonds in a sum exceeding $300,000 00.

The petitioners alleged, that they are unsecured holders of bonds and coupons, issued by the M. & W. P. R. R. Co., in January 1866, and in July 1870, and have obtained judgments against the Western Railroad Company of Alabama, upon which execution has been returned unsatisfied; that at the time of the consolidation of the two companies, the M. & W. P. R. R. Co. was solvent and the property worth largely more than its debts; while the Western Railroad was

insolvent and its railroad unprofitable; that the acquisition of the M. & W. P. R. R., and the purchase of the consolidated roads, &c., by the aid of chancery suit, was the result of a conspiracy of the two Georgia railroad companies, their officers and agents, to defraud petitioners and other unsecured creditors of the M. & W. P. R. R. Co., &c.

The petitioners further allege that the two Georgia companies were prior to to the consolidation, owners of more than half of the stock of the Western Railroad Company of Alabama, and that at a meeting of the stockholders of the M. & W. P. R. R. Co., just before the consolidation, the presidents of these two were elected directors, with others named, and that in this way the conspiracy was sought to be consumated.

On the 31st day of March, 1874, Josiah Morris and Robert H. Lowery, trustees in a certain mortgage or deed of trust, executed by the Western Railroad Company of Alabama, filed their bill in the chancery court of Montgomery, against that Company and other persons, praying a foreclosure, the appointment of a receiver, &c.

The bill showed the following facts :

1. The execution of a mortgage by the M. & W. P. R. R. Co., to secure bonds amounting to $750,000.

2. The execution by the M. & W. P. R. R. Co., of another mortgage to secure $45,000 of bonds conveying, for that purpose, the railroad, &c., of the M. & W. P. R. R. Co., from Montgomery to West Point and Columbus.

3. The execution of a mortgage by the Western R. R. Co., of Alabama, of its road from Montgomery to Selma, to secure bonds for $600,000.

4. That after the execution of these three mortgages, the defendant, the Western R. R. Co., of Alabama, in pursuance of authority in its charter, purchased the railroad and property of the M. & W. P. R. R. Co.

5. That after such purchase, the defendants executed to complainants a mortgage conveying its whole road, &c., from Selma to Montgomery, and Montgomery to West Point and Columbus, to secure $1,200,000 of bonds, and that this mortgage was subordinate to the lien of the two mortgages executed by the M. & W. P. R. R. Co., as to the property embraced in them, and subordinate also to the first mortgage of the W. R. R. Co., of Alabama, as to the property embraced in it.

6. That the bonds of the two mortgages executed by the W. R. R. Co., of Alabama, were endorsed or guaranteed by the Georgia Railroad and Banking Company, and The Cen-

tral Railroad and Banking Company of Georgia, both corporations under the laws of Georgia, and made defendants to the bill.

7. That the property conveyed by the mortgages of the M. & W. P. R. R. Co., was sufficient in value to pay the bonds, having a first lien on it, and the property conveyed by the first mortgage of the W. R. R. Co., of Alabama, was sufficient to secure the first mortgage of the W. R. R. Co., but that the whole was not sufficient to secure those debts, and the complainant's mortgage of $1,-200,000.

8. That the interest coupons on the bonds of the M. & W. P. R. R. Co., were due and unpaid for several years, and the coupons on the bonds of $1,200,000, and $600,000, for several years had been paid by the guarantors, and the means of the defendant, (the W. R. R. Co.,) were being diverted from the said trusts, &c.

All the mortgagees were made defendants, as, also the Georgia Railroad and Banking Company, the Central Railroad and Banking Company of Georgia, and the Western Railroad Company; and each of the defendants answered, admitting the allegations of the bill. A decree of sale was rendered at December term, 1874, of the chancery court, and by its terms the property was not to be sold for less than enough to pay all the mortgage debts. It was estimated that the property conveyed by the mortgages, lying in Georgia, was of the value of $150,000, and as it was not to be sold, and was left still subject to their mortgages there, the mortgage creditors of the M. & W. P. R. Co., were willing that the limits of the bid should be $150,000, less than the whole amount of all the mortgages.

The decree further stipulated that if the bid at such limit was not made by any other person, that then the guarantors of the bonds of the W. R. R. Co., the Georgia Railroad and Banking Company, and The Central Railroad and Banking Company or either of them, might become the purchasers, and should be required to pay in cash only the amount of past due coupons, and expenses of sale, with amounts advanced by the guarantors; the remainder secured on the property by liens in the order of priority, and bond holders to have the right to apply for enforcement as coupons or bonds became due, &c.

The sale was made by the register, and the property bid in by the Georgia Railroad and Banking Company, and the Central Railroad and Banking Company. The Georgia Railroad and

Banking Company being notified of application for injunction, by one of the stockholders of that company, did not comply, but the Central Railroad and Banking Company offered to complete the purchase, and so the register reported, and asked for instructions as to receiving the money and making the conveyance.

At this stage of the proceedings, Branch, Sons and Company appeared and presented a petition praying that they might be made defendants to the original bill, for leave to answer and file a cross-bill and for other relief.

The prayer of the petition, and other allegations therein made, are given so fully in the opinion that they need not be here repeated.

The chancellor overruled the petition, and application is now made by *mandamus* to compel him to grant it.

PETTUS & DAWSON, and WATTS & WATTS for petitioners.

Whenever a trust fund is in the custody of a court of chancery, any person claiming an interest therein may *petition* the court to be permitted to come in, and assert his claim. *David* v. *Froud*, 1 Milyne and Keen 200; *Williams* v. *Gibbs*, 17 Howard, U. S. 255; *Wiswall* v. *Simpson*, 14 Howard 52, Story's Equity Pleading § 106 and note 1; 9 Wallace 175.

In the case of *Finley* v. *U. S. Bank*, 10 Wheaton, 304, Chief Justice MARSHALL fully recognizes the right, but denied the petition in that case, because the decree had been virtually carried into effect. The facts shown by the petition, establish that petitioners have "a right to, an interest in, or a lien legal or equitable, on the trust property," and this right can be asserted by petition. The court will endeavor to do complete justice—to finish litigation—to pass upon the rights of *all* the parties—especially upon the foreclosure of mortgages.

Petitioners have no remedy by appeal, for only parties to the decree can appeal. Their only adequate and specific remedy is by petition.

Upon the facts stated the purchasers are not *bona fide* purchasers for value without notice, and no injustice can be done by hearing petitioners complaint, and allowing the relief prayed, instead of requiring a separate bill and the expense of litigation *de novo*. See Story's Equity Pleadings, 207 and 208.

The main argument of the counsel was addressed to showing the rights of Branch, Sons & Co., under the facts stated,

to follow the trust property and have satisfaction out of it, and that they were necessary parties to the original bill; but as the court did not pass upon this feature of the case, the argument thereon is omitted.

A. R. LAWTON, H. C. SEMPLE, and D. S. TROY, *contra.* Branch, Sons & Co. were not necessary or even proper parties, to the orignal bill filed in this cause. That bill was for foreclosure of a mortgage, and was not a creditor's bill. To hold that the petitioners were necessary parties, would be to hold that complainant could not foreclose their mortgage, otherwise than by creditor's bill. It is true the officers of a corporation are *quasi* trustees for creditors, but it has never been held that this *quasi* trusteeship made it necessary to make stockholders or general creditors, parties to foreclose a mortgage made by a corporation. The petition proposes to change the entire character of the litigation, and will in effect indefinitely prolong the settlement of the questions adjudged in the suit. Confirmation of the sale can do the petitioners no harm, their rights are not prejudiced, nor are they bound by the decree. The case is one in which petition is not an appropriate remedy.

No authority can be found to sustain the position contended for by petitioners. "It is not in all cases that a petition is a proper course to reach a fund in chancery."

*If new parties are to be made* "not necessary to the orig-"inal bill, and when the investigation may involve inquiries, "calculated by postponing the cause, *to delay parties not* "interested in such new inquiries, the proceeding "must be by bill." *Hell* v. *Miller*, 9 Gill and Johnson 93; *Peoples Bank* v. *Hamilton Manufacturing Company*, 10 Paige 482; Mitford Chancery Pl. 424 and note.

MANNING, J.—The cause of Morris and Lowery, trustees, &c. *vs.* the Western Railroad Co., and others lately decided in the chancery court of Montgomery county, to which petitioners pray this court will by *mandamus* compel the chancellor to make them parties defendant, is one of peculiar and uncommon features and of great importance. We do not, however, on this motion, have occasion to comment on them.

The final decree was rendered on the 18th of December, 1874, and ordered an inquiry and report to be made by the register, as master, of the amount of the two series of mortgage bonds, first and second, issued by the late Montgomery and West Point Railroad Company, and charged upon its

[*Ex parte* Branch & Co.]

railroad, and of the first mortgage bonds issued by the Western Railroad Co. of Alabama, charged upon the railroad, which was all it then owned, extending from Montgomery to Selma, and of the second mortgage bonds of the Western Railroad Co. of Alabama, issued after the acquisition by that company of the Montgomery and West Point Railroad and the incorporation of it with its own road aforesaid from Montgomery to Selma, making a continuous road from West Point on the eastern border of the State through Montgomery to Selma, a distance of about 150 miles, now called the Western Railroad of Alabama, and which is charged with the payment of the last aforesaid bonds: The register was further instructed to inquire and report the amount of the past due and unpaid coupons for interest, of said several series of bonds, with interest at 7 per cent. thereon from the time of the maturity of the coupons, respectively, and the costs and expenses of the suit, including commissions to the register for the sale of said railroads, commissions to the trustees, plaintiffs in the suit, and the fee of their solicitor. And after ascertaining the amount of all of these latter sums, which must be paid in ready money, and the amount of the bonds which are not yet due, the register was instructed to offer all the property of said Western Railroad Company in Alabama for sale at auction for cash, requiring as the *minimum* bid therefor the total amount of all said bonds, and past due coupons and other items aforesaid, less $150,000, the estimated value of that part of the company's property which was situated in Georgia beyond the boundary line of this State.

The total sum aforesaid, less said $150,000, amounted on the day of sale, April 19th, 1875, to $3,129,166.01, and no person having bid said amount in cash, the entire property was sold, according to directions in the decree, to the Central Railroad and Banking Company of Georgia, and The Georgia Railroad and Banking Company, both corporations of the State of Georgia, and guarantors of the mortgage bonds of the Western Railroad Company, for the sum last above mentioned, of which they were required to pay in cash, or past due coupons of said bonds, the amount of all of said past due and unpaid coupons with interest, and the costs, commissions, expenses and fees aforesaid, and to pay the principal of said bonds and coupons, not yet due, for interest, as they shall respectively become due and payable. The entire amount bid was thus appropriated by the decree, to the payment of the said costs, expenses, commissions, fees, and past due coupons in cash and to the payment of

the bonds secured by the mortgages aforesaid, as they should, respectively, become due and payable, without any provision for the other creditors of the Montgomery and West Point, or Western Railroad Company.

After this sale was made, and before confirmation thereof, to-wit, on the 10th of May 1875, the petitioners, Branch, Sons & Co., filed their petition, setting forth that they were unsecured creditors of the late Montgomery and West Point Railroad Company, and holders of its bonds and coupons past due and unpaid; that these were a part of a like unsecured indebtedness of that company amounting to about $300,000; that the railroad of said company and the appertenances thereof were well worth $2,000,000, and its entire indebtedness did not exceed $300,000, and the company was entirely solvent, when it was dissolved and its road was incorporated with that of the Western Railroad Company in 1870; while on the contrary, the latter company was insolvent, and its railroad unprofitable, that the so-called purchase, or acquisition by the Western Railroad Company of the Montgomery and West Point Railroad, and the recent purchase of the consolidated roads, property and effects of both of the companies, through the aid of the court in said suit, were the work and results of a scheme and conspiracy of the two Georgia railroad companies, their presidents, John P. King, and Wm. M. Wadley and others, named, who had got control of the Alabama companies, and (which Georgia companies were guarantors of the bonds of the Western Railroad Company,) to defraud the unsecured creditors of the Montgomery and West Point Railroad Company of payment of its debts to them, and to get all its property discharged therefrom ; that this property was a trust fund in the hands of the company, and afterwards and especially in the hands of the Western Railroad Company, for the payment of all the creditors, both those without and those with mortgage liens, of said Montgomery and West Point Railroad Company ; that these creditors ought all to have been made parties to the suit of Morris and Lowery, trustees, in this cause, &c., &c. Wherefore, petitioners "pray that they may be permitted to come in and be made parties defendant to this cause, and that the decrees heretofore made in this case may be set aside, and that the sale of the property of the said Montgomery and West Point Railroad Company made on the 19th of April 1874, may be set aside and held for naught, and that petitioners may be permitted to file an answer to the bill filed in this cause, and that they be permitted to file their answer as a cross bill—and may it please your Honor

Vol. LIII.

*[Ex parte Branch & Co.]*

to grant such further, and other and different relief, as they may be entitled to under the facts in this petition stated."

The chancellor denied the motion and dismissed the petition; and an application is now made to this court for a *mandamus* or other appropriate writ requiring him to admit petitioners to become parties defendant, to have said decree set aside and let them file an answer, &c., as prayed for in the petition.

The counsel who prepared this petition perceived that the facts therein set up by allegation, require a larger field for their development, and opportunity for more vigorous action than is afforded generally to a petitioner who comes into a cause to attend to the details of the distribution of a fund in court, and to claim his share. Hence, as will be seen, these petitioners pray to be made parties defendant, *and* that the decree be set aside, *and* that they be permitted to file an answer, and a cross bill, &c., &c. Without being allowed all this liberty, they cannot, they conceive, obtain the redress and relief they are entitled to; and accordingly their petition is for nothing less than this. For although they pray also for such *further and* other *and* different relief as they may be entitled to, this is prayed for conjunctively with and in addition to the things previously insisted on, and not disjunctively or without them. The effect of a prayer in this form is considered and explained in *Cotton* v. *Ross*, (2 Paige 396) and *Graham* v. *Cook, et. al.*, (48 Ala. 103.) It does not allow so much scope for a decree different from that specifically asked, as it would if disjunctively expressed.

This court long since held that when a petitioner avers in his petition the purpose for which he desires to be a party to the former suit,   *   *   *   *   *   *   to this purpose he must be held; and also that the court should not do a nugatory act, by allowing the petition for an avowed purpose which the court cannot permit to be accomplished. *Boykin* v. *Kernochan*, 24 Ala. 699.

Moreover, it has "always been held to be a sound rule of practice that a plaintiff should not be permitted to introduce into a corner of a bill, some secondary and trivial claim, on which if it stood alone he might be entitled to succeed, in order, as it were to catch a decree on a minor point, in the event of his failing in the main object of his suit." *Kendall* v. *Beckett*, 2 Russ and Myl. 88; and such a petition as this would be subject to that rule.

The chancellor in considering this petition, must have regarded its particular and express purpose to be the setting aside of a decree from which petitioners could derive no ad-

[Ford *v.* The State.]

vantage, after the expiration of the term in which it was rendered, and the re-opening of the case, and allowing other facts and allegations set forth in the petition, and evidence thereof, to be introduced into the cause, that would change its entire character.

Having these views, the chancellor must have overruled the motion and dismissed the petition, unless he possessed the power, and the case was one in which it should properly be exercised, to carry into effect the object of the petitioners. Did he have that power? No precedent in which it was employed has been produced by the learned counsel who appear in support of this application; and we know of none, or of any principle of equity practice, which would justify a chancellor in the exercise of such a large discretionary authority.

It is possible, perhaps, that if the petitioners had set forth that they were advised and insisted, that upon the pleadings and evidence in the cause before the chancellor, the decree therein was erroneous and would be reversed on appeal, and had shown that they had such an interest in the subject matter that they ought to have been made parties to the cause at the beginning, and had prayed that they might now be made parties to enable them to seek redress by appeal to this court to have the decree reversed—a case might have have been made in which the prayer should have been granted. We do not now decide, however, that this would be so. The cases of *Watson and Wife* v. *May*, 8 Ala. 177; *Lees* v. *Brownings*, 15 *id.* 495; and *Boykin* v. *Kernochan*, 24 *id.* 699, seem to indicate that the power in question might, to that extent, and under such a state of facts, be properly exercised. Such was not the case made by the petition presented to the chancellor, or, of course, that which is brought before us.

The application for a *mandamus* must be denied.